## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

VERSANT POWER, and ENMAX
CORPORATION,                                )
                                            )
            Plaintiffs,                     )          Civ. No.
                                            )
       v.                                   )
                                            )
WILLIAM J. SCHNEIDER, DAVID R.              )
HASTINGS III, SARAH E. LECLAIRE,            )
STACEY D. NEUMANN, and DENNIS               )    **VERIFIED COMPLAINT FOR**
MARBLE, in their official capacities as     )    **DECLARATORY JUDGMENT**
members of the MAINE COMMISSION             )    **AND INJUNCTIVE RELIEF**
ON GOVERNMENTAL ETHICS AND                  )
ELECTION PRACTICES, the MAINE               )
COMMISSION ON GOVERNMENTAL                  )
ETHICS AND ELECTION PRACTICES,              )
and AARON FREY, in his official capacity as )
ATTORNEY GENERAL OF THE STATE               )
OF MAINE,                                   )

            Defendants.


Plaintiffs, Versant Power ("Versant") and ENMAX Corporation ("ENMAX") (Versant and

ENMAX, collectively, "Plaintiffs"), by and through their undersigned counsel, file this Complaint

against Defendants William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Stacey D.

Neumann, and Dennis Marble, in their official capacities (collectively, the "Commissioners") as

members of the Maine Commission on Governmental Ethics and Election Practices (the

"Commission"), and Aaron Frey, in his official capacity as the Attorney General of the State of Maine

("Frey") (the Commissioners and Frey, collectively, "Defendants") .

### Nature of the Action

1.      This action challenges the constitutionality of "An Act to Prohibit Campaign Spending

by Foreign Governments and Promote an Anticorruption Amendment to the United States

Constitution" (the "Act").

2.     The Act was approved by Maine's voters on November 7, 2023, and its effective date of January 5, 2024, is imminent.

3.     The Act would prohibit, upon threat of civil and criminal penalties, a "foreign government-influenced entity" from making any contribution, expenditure, independent expenditure, donation, or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum.

4.     The Act also imposes on each "foreign government-influenced entity" the requirement to conspicuously display on any other public communication regarding policy or the public interest, that are intended to influence the public or a public official or agency, that the communication is "sponsored by" a "foreign government-influenced entity."

5.     Versant, a Maine corporation, and its parent ENMAX, a Canadian business corporation, have, in the past, engaged in lawful acts of political association and expression within the State of Maine, including through in-kind donations and disbursements of funds to a ballot question committee ("BQC"). In addition, Versant has engaged in lawful acts of political expression within the State of Maine, including through in-kind donations and disbursements of funds to political action committees ("PACs") in connection with federal, state, or local elections of candidates.

6.     Versant and ENMAX wish to continue expressing their political views on matters that affect Versant and its employees, customers, and other stakeholders by making in-kind donations and disbursements of funds to BQCs. Versant also wishes to continue doing so by making in-kind donations and disbursements of funds to PACs.

7.     However, because both Versant and ENMAX qualify as a "foreign government-influenced entity" under the Act, they would be banned from doing so. And this is so notwithstanding that no foreign government has ever influenced any political spending of either Versant or ENMAX, nor has the power to do so in the future.

8. Likewise, the Act compels Versant and ENMAX to qualify any other future public communications they make that are intended to influence public policy with the following conspicuous description: the communication is **"Sponsored by Versant/ENMAX, a foreign government-influenced entity."** Versant and ENMAX must broadcast this message notwithstanding that no foreign government has ever influenced any political spending of either Versant or ENMAX, nor has the power to do so in the future.

9. The Act's prohibitions and restrictions on the ability of a "foreign government-influenced entity" from engaging in core political speech is unconstitutional because it violates the "Supremacy Clause" of the United States Constitution, Article IV, Clause 3, inasmuch as it is preempted by the Federal Election Campaign Act, 52 U.S.C. § 30121 ("FECA").

10. The Act's ban on Versant's core political speech violates Versant's rights, as well as those of every other "foreign government-influenced entity" that also is a United States corporation, to engage in core political speech under the First and Fourteenth Amendments to the United States Constitution.

11. The Act's discrimination against alien corporations, including ENMAX, in favor of those incorporated under the laws of the United States is unconstitutional because it violates the "Dormant Foreign Commerce Clause," Article I, Section 8, Clause 3 of the United States Constitution, because it directly interferes with the federal government's ability to speak with one voice in regulating commercial relationships with foreign governments and foreign companies.

12. Accordingly, Plaintiffs seek a declaratory judgment that the Act is unconstitutional on its face and as applied to them, a corresponding preliminary, and then permanent, injunction preventing implementation and Defendants' enforcement of the Act, and an award of attorneys' fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. §§ 1983 and 1988(b).

**Jurisdiction and Venue**

13.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution of the United States and the laws of the United States, including the First and Fourteenth Amendments and Foreign Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, FECA, and the Civil Rights Act, 42 U.S.C. §§ 1983, 1988.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because this is the judicial district in which Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

**The Parties**

15.    Plaintiff Versant Power is a corporation organized and existing under the laws of the State of Maine with a principal place of business located in Bangor, Maine.

16.    Plaintiff ENMAX Corporation is a business corporation organized and existing under the laws of the Province of Alberta, Canada, with a principal place of business located in Calgary, Alberta, Canada.

17.    Defendant William J. Schneider serves as a member of the Commission and is charged by the Act with the authority to enforce its provisions, including the assessment of penalties for violations of the Act.

18.    Defendant David R. Hastings III serves as a member of the Commission and is charged by the Act with the authority to enforce its provisions, including the assessment of penalties for violations of the Act.

19.    Defendant Sarah E. LeClaire serves as a member of the Commission and is charged by the Act with the authority to enforce its provisions, including the assessment of penalties for violations of the Act.

20.    Defendant Stacey D. Neumann serves as a member of the Commission and is charged by the Act with the authority to enforce its provisions, including the assessment of penalties for violations of the Act.

21.    Defendant Dennis Marble serves as a member of the Commission and is charged by the Act with the authority to enforce its provisions, including the assessment of penalties for violations of the Act.

22.    Defendant Aaron Frey serves as the Attorney General of the State of Maine and is charged by Maine law with authority to enforce the Act, including by the charge of a Class C crime.

**Background**

A.    **Maine's Legislative Power Is Vested In Both The Legislature And The Voters**

23.    The Maine Constitution confers direct legislative powers on Maine's citizens. These rights, and the processes for exercising them, are governed by Art. IV, Pt. 3, §§ 17-20 and 22 of the Maine Constitution and 21-A M.R.S. §§ 901-907.

24.    There are two mechanisms by which citizens can place legislative matters on the statewide ballot: (i) citizen initiatives, which propose new statutes, that, if approved, become new state laws and (ii) veto referenda, which, if approved, nullify existing statutes.

25.    Because citizen initiatives are considered an exercise of legislative power, they are tantamount to statutes enacted by the Legislature.

26.    Once a citizen initiative is certified by the Secretary of State for inclusion on the statewide ballot, the initiative is presented to the Legislature for its consideration.

27.    The Legislature can preempt a citizens' vote on an initiative by enacting it into law, verbatim and without amendment, prior to the statewide election.

28.    If the Legislature fails to enact an initiative into law, the voters serve as the legislative body to determine whether to do so.

B.    **Genesis Of The Act**

29.    State Senator Richard A. Bennett, along with five designated Maine voters, filed an application for the Act as a citizen initiative with the Secretary of State.

30.    The language of the Act was finalized by the Secretary of State and was certified to appear on the November 7, 2023, ballot.

31.    Thereafter, the Secretary of State transmitted the Act, which was identified as L.D. 1610, to the Clerk of the Maine Legislature.

32.    During the Special Session of the 131st Legislature, a majority in both the Maine Senate and House of Representatives voted in favor of L.D. 1610, verbatim and without amendment. Thus, L.D. 1610 was passed to be enacted and sent to the Governor for signature.

33.    The Governor vetoed L.D. 1610 on the grounds, among others, that its regulation of political speech violated the First Amendment.

34.    The Maine House failed to override the Governor's veto of L.D. 1610.

35.    The Act, therefore, was submitted to the voters and approved by the vote of a majority of Maine's registered voters on November 7, 2023.

36.    The Governor issued a public proclamation of the result of the vote on the Act on December 6, 2023, as required by Article 4, Part 3, § 19 of the Maine Constitution.

37.    The Act will become effective thirty days after the Governor's proclamation, on January 5, 2024.

C.    **Pertinent Provisions Of The Act**

38.    The Act makes a number of substantial changes to Maine's present election laws through the adoption of 21-A M.R.S. § 1064, which is entitled "Foreign government campaign spending prohibited."

39.    Among other things, the Act creates a new category of political speaker, the so-called

"foreign government-influenced entity," which is defined as:

(1)    A foreign government; or

(2)    A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity:

    (a)    Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or

    (b)    Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E).

40.    The Act defines "foreign government" as including "any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated." 21-A M.R.S. § 1064(1)(D).

41.    A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

42.    Subsection (2) of the Act bans a "foreign government-influenced entity" from campaign spending. In that respect, the Act declares that:

**2.  Campaign spending by foreign governments prohibited.** A foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the

initiation or approval of a referendum.

21-A M.R.S. § 1064(2).

43.    Subsection (3) of the Act also prohibits a person from "knowingly solicit[ing], accept[ing] or receiv[ing] a contribution or donation prohibited by subsection 2." 21-A M.R.S. § 1064(3).

44.    Subsection (1)(A) of the Act adopts the definition of "contribution" found at 21-A M.R.S. § 1012(2) and §1052(3), which includes any "gift, subscription, loan, advance or deposit of money or anything of value" made for the purpose of influencing the nomination or election of a candidate for state, county, or municipal office or initiating or influencing a ballot measure.

45.    Subsection (1)(C) of the Act adopts the definition of "expenditure" found at 21-A M.R.S. § 1012(3) and § 1052(4), which includes any "purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value" made for the purpose of influencing the nomination or election of any person to state, county, or municipal office or for the purpose of initiating or influencing a campaign.

46.    Subsection 4 of the Act further bans any person from providing substantial assistance to a "foreign government-influenced entity" in violating that Act. It states:

> **4. Substantial assistance prohibited.** A person may not knowingly or recklessly provide substantial assistance, with or without compensation:
>
> A. In the making, solicitation, acceptance or receipt of a contribution or donation prohibited by subsection 2; or
>
> B. In the making of an expenditure, independent expenditure, electioneering communication or disbursement prohibited by subsection 2.

21-A M.R.S. § 1064(4).

47.    "Structuring" is also barred by the Act under subsection (5), which declares that:

> **5. Structuring prohibited.** A person may not structure or attempt to

> structure a solicitation, contribution, expenditure, independent
> expenditure, electioneering communication, donation, disbursement
> or other transaction to evade the prohibitions and requirements in this
> section.

21-A M.R.S. § 1064(5).

48.    Subsection (6) of the Act also regulates communications by a "foreign government-influenced entity" to influence public policy that are not otherwise banned by the Act. It states as follows:

> **6. Communications by foreign governments to influence policy;**
> **required disclosure.** Whenever a foreign government-influenced
> entity disburses funds to finance a public communication not
> otherwise prohibited by this section to influence the public or any
> state, county or local official or agency regarding the formulation,
> adoption or amendment of any state or local government policy or
> regarding the political or public interest of or government relations
> with a foreign country or a foreign political party, the public
> communication must clearly and conspicuously contain the words
> "Sponsored by" immediately followed by the name of the foreign
> government-influenced entity that made the disbursement and a
> statement identifying that foreign government-influenced entity as
> a "foreign government" or a "foreign government-influenced entity."

21-A M.R.S. § 1064(6).

49.    The Act grants authority to the Commission to "assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater." 21-A M.R.S. § 1064(8).

50.    Under the Act, a person who knowingly violates any of subsections (2) through (5) commits a Class C crime, which is punishable by up to five years' imprisonment. 21-A M.R.S. § 1064(9); see also 17-A M.R.S. § 1604(1)(C)

**D.**    **Pertinent Provisions Of FECA**

51.    FECA was originally enacted in 1971 to regulate the raising and spending of money in

United States' elections and has undergone a number of amendments since its enactment.

52.    Among other things, FECA bans foreign nationals from making political expenditures

and from making contributions to political parties and candidates.

53.    The relevant provision of the statute reads:

(a)  Prohibition

It shall be unlawful for—

(1)  a foreign national, directly or indirectly, to make—

(A) a contribution or donation of money or other thing of value, or to
make an express or implied promise to make a contribution or
donation, in connection with a Federal, State, or local election;

(B) a contribution or donation to a committee of a political party; or

(C) an expenditure, independent expenditure, or disbursement for an
electioneering communication (within the meaning of section
30104(f)(3) of this title); or

(2)  a person to solicit, accept, or receive a contribution or donation
described in subparagraph (A) or (B) of paragraph (1) from a
foreign national.
…

52 U.S.C. § 30121(a).

54.    The statute defines "foreign national" to include "an individual who is not a citizen of

the United States or a national of the United States … and who is not lawfully admitted for permanent

residence …." 52 U.S.C. § 30121(b)(2).

55.    The statute further defines "foreign national" to include a "foreign principal," such as

that term is defined by 22 U.S.C. § 611 (b). Section 611(b) defines a foreign principal as:

(1)  a government of a foreign country and a foreign political party;

>    (2) a person outside of the United States, unless it is established that
>    such person is an individual and a citizen of and domiciled within the
>    United States, or that such person is not an individual and is organized
>    under or created by the laws of the United States or of any State or
>    other place subject to the jurisdiction of the United States and has its
>    principal place of business within the United States; and
>
>    (3) a partnership, association, corporation, organization, or other
>    combination of persons organized under the laws of or having its
>    principal place of business in a foreign country.

56.     FECA expressly declares that "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143.

57.     The Federal Election Commission ("FEC") has adopted a Rule pursuant to FECA that likewise provides that "Federal law supersedes state law concerning the … [l]imitations on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b)(3).

**E.    The Corporate Structure And Relationship Between Versant And ENMAX**

58.     The City of Calgary, Alberta, Canada (sometimes, the "City"), is the sole shareholder of ENMAX.

59.     ENMAX is a provider of energy services and products, which operates primarily through three business units: ENMAX Power, ENMAX Energy, and Versant.

60.     ENMAX Power is an electrical transmission and distribution utility that operates electrical infrastructure within the City of Calgary.

61.     ENMAX Energy is an electricity and natural gas provider and wholesale electricity generator that operates within the Province of Alberta, Canada.

62.     Versant, formerly known as Emera Maine, is an electrical transmission and distribution utility that, in its present name and prior names, has operated continuously and exclusively within the State of Maine for more than ninety-nine years, serving its customer ratepayers in northern and eastern

Maine.

63.     Effective March 24, 2020, ENMAX US Holdco, Inc., a wholly-owned subsidiary of ENMAX, purchased all of the common stock of BHE Holdings, Inc., which was the sole shareholder of the common stock of Emera Maine (the "Emera Maine Acquisition").

64.     Upon consummation of the Emera Maine Acquisition, Emera Maine became an indirect subsidiary of ENMAX.

65.     Effective May 11, 2020, Emera Maine changed its name to Versant Power.

**F.      No Foreign Government Controls Or Even Participates In ENMAX's Operations Or Management Or Versant's Operations, Management, or Governance**

66.     Notwithstanding its ownership of the stock of ENMAX, and as further explained below, the City does not have any decision-making authority over, or even the ability to participate in, the operations or management of ENMAX or the operations, management, or governance of Versant. To the contrary, the City is expressly prohibited from doing so.

67.     At the time of the Emera Maine Acquisition, Emera Maine was subject to regulation by, among others, the Maine Public Utilities Commission (the "PUC"), which regulation continues to this date.

68.     As part of the PUC's regulation of Emera Maine, the Emera Maine Acquisition required PUC approval, pursuant to 35-A M.R.S. § 708(2).

69.     A petition seeking PUC approval of the Emera Maine Acquisition was filed with the PUC on or about May 7, 2019 (the "PUC Proceeding"). A number of parties, including ENMAX, ENMAX US Holdco, Inc., the Office of the Public Advocate, Emera Maine customers, and adjacent utilities were granted leave to intervene in the PUC Proceeding.

70.     The PUC Proceeding was protracted, and included extensive pre-filed testimony of interested parties, substantial discovery, and numerous hearings and settlement conferences.

71.     As a result of settlement discussions among the interested parties and the PUC,

ENMAX, ENMAX US Holdco, Inc., the Public Advocate, and other interested parties agreed to a stipulation that was presented to the PUC on December 9, 2019, for inclusion in a PUC order that would approve the Emera Maine Acquisition (the "Stipulation").

72.    The PUC then convened several hearings to address the Stipulation as well as proposed additional terms. The interested parties and the PUC also engaged in additional settlement conferences.

73.    Among the issues addressed by the parties and the PUC was whether the Emera Maine Acquisition would result in a loss of local control.

74.    This issue was material with respect to the PUC Proceeding because, in considering whether to approve the Emera Maine Acquisition, the PUC was required by 35-A M.R.S. § 708(2)(C)(2) to examine whether the transaction would "result in a loss of local control of the utility's management and operations in a manner that limits the ability of local management to protect the interests of the utility's ratepayers in [Maine]."

75.    The PUC and certain interested parties expressed concern that because ENMAX US Holdco, Inc. (the entity that would be acquiring Emera Maine), was the subsidiary of a Canadian corporation (ENMAX) whose stock was wholly owned by a foreign government shareholder (the City), Emera Maine's operations ultimately would be subject to control by a foreign company and a foreign government.

76.    To address these concerns regarding local control, ENMAX, ENMAX US Holdco, Inc., the Public Advocate, and other interested parties entered into a revised Stipulation dated on or about March 11, 2020 (the "Revised Stipulation").

77.    Among other things, the Revised Stipulation placed limitations and conditions on the operations, management, and governance of ENMAX and Emera Maine to ensure that the City had no ability, whatsoever, to participate in the operations or management of ENMAX or the operations,

management, or government of Emera Maine.

78.    Paragraphs 15 and 16 of the Revised Stipulation, dealing with governance and directors, provide that:

> 15.    <u>Governance</u>. Emera Maine will continue to operate as a stand-alone utility in Maine following the Closing Date. ENMAX's shareholder, **The City of Calgary (the "City"), will have no decision-making authority regarding Emera Maine's operations and management and no ability to elect the directors of Emera Maine. No director or officer of ENMAX or any of its subsidiaries, including BHE Holdings, Emera Maine and its subsidiaries, will be a council member or employee of the City. All independent directors serving on the Emera Maine Board of Directors will be prohibited from (i) serving on the Board of Directors of ENMAX Corporation or any direct or indirect subsidiary thereof (other than Emera Maine) or (ii) having any material relationship with the City of Calgary.**

> 16.    <u>Independent Directors</u>. Emera Maine will continue to have a board governance structure that in all material respects will be the same as the structure that currently exists for Emera's indirect ownership of Emera Maine. **Emera Maine's board of directors will continue to have a board consisting of nine members, with four independent board members (independent as defined by the rules of the New York Stock Exchange, including independence from Emera Maine, ENMAX and its other affiliates). In addition, four of the nine board members will be residents of New England.** ENMAX will ensure that Emera Maine's Board meets these requirements within a reasonable time period following the Closing Date and within a reasonable time following any Director turnover. BHE Holdings also will have at least one independent director.

(Emphasis added).

79.    Paragraphs 31 and 32 of the Revised Stipulation, dealing with commingling of funds and separate books/money pooling and records, provide that:

> 31.    <u>No Commingling of Funds; No Money Pool</u>. BHE Holdings and Emera Maine will not commingle its funds or other assets with the funds or other assets of any other entity and shall not maintain any funds or other assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual funds or other assets from those of ENMAX or its other subsidiaries or affiliates. Emera Maine may not participate in any money pool arrangements without the prior approval of the Commission.

> 32. <u>Separate Books and Records</u>. Any monetary transactions between Emera Maine, ENMAX and/or its subsidiaries and affiliates will be accounted for and properly recorded in the respective companies' books and records and Emera Maine's cash flows will not be commingled with the cash flows of ENMAX and/or its subsidiaries.

80.    Based, in part, on these provisions of the Revised Stipulation concerning local control, the PUC formally approved the Emera Maine Acquisition by Orders dated March 19, 2020, and April 21, 2020 (together, the "PUC Orders").  Among other things, the PUC Orders expressly incorporated the terms of the Revised Stipulation.

81.    The provisions of the PUC Orders and Revised Stipulation ensuring that the City has no decision-making authority, or even the right to participate in the operations or management of ENMAX or the operations, management, or governance of Versant, are further embodied in certain of ENMAX's and Versant's corporate documents.

82.    For example, pursuant to a Resolution of the Sole Shareholder of ENMAX dated March 15, 2019, the City acknowledged and agreed that:

> 3. . . . [N]o Council members of the City of Calgary will be permitted to be directors of any of the Emera Maine Companies … .
>
> 4. . . . [The City] shall not have appointment, consent or approval rights regarding any directors or members of the executive management of any of the Emera Maine Companies.
>
> 5. . . . [The City] shall not have consent or approval rights for the management, business or operations matters of the Emera Maine Companies.

83.    Pursuant to an Amended and Restated Unanimous Shareholder Agreement dated May 3, 2019, the City further acknowledged and agreed to three conditions summarized as follows:

> (i)    No Council members of the City are permitted to be directors of ENMAX or any of its subsidiaries;
>
> (ii)    The City has the power and authority to elect, re-elect, and

remove ENMAX's directors; (this condition, however, left the ability to nominate candidates solely with ENMAX's board) and;

(iii)    The Agreement can be terminated only with the mutual agreement of both the City and ENMAX.

84.    Section 3.1 of Article III of Versant's Bylaws governs the composition of Versant's Board of Directors.

85.    Among other things, section 3.1 requires that Versant have independent and locally-resident directors and expressly prohibits office holders and employees of the City from serving as directors of Versant.  It provides, in pertinent part, that:

> The Corporation's Board of Directors will consist of nine (9) directors designated by the Shareholder, of whom four (4) directors shall be Independent Directors. At least four (4) of the nine (9) directors will be residents of the New England region of the U.S., as determined in good faith by the Shareholder. Following the consummation of the Purchase or any director turnover, the Shareholder will have a reasonable period of time to ensure compliance with the director composition and residency requirements of this Section 3.1, and the Board of Directors may continue to exercise all the powers of the Corporation during such period of time.
>
> . . . ***No council member or employee of The City of Calgary is permitted to be a director of the Corporation or any of its Subsidiaries.***

(Emphasis added).

86.    Section 5.1 of Article V of Versant's Bylaws governs the composition of Versant's officers and prohibits office holders and employees of the City from serving as officers of Versant.  It provides, in pertinent part, that "***No council member or employee of the City of Calgary is permitted to be an officer of the Corporation or any of its Subsidiaries.***" (Emphasis added).

87.    The terms of the Revised Stipulation, the PUC Orders, the Resolution of the Sole Shareholder of ENMAX dated March 15, 2019, the Amended and Restated Unanimous Shareholder Agreement dated May 3, 2019, and Versant's Bylaws dated October 22, 2020, all remain in full force and effect.

16

88.     No representative of the City has ever served as an officer or director of Versant and no representative of ENMAX has ever served as an officer of Versant.

**F.      ENMAX's And Versant's Past And Expected Future Political Speech**

89.      FECA, 52 U.S.C. § 30121(a), bars foreign nationals, including alien corporations, from donating or spending money in connection with federal, state, or local elections of candidates.

90.     FECA does not prohibit alien corporations from donating or spending money in connection with referenda.

91.     While ENMAX has never made a donation or spent monies in connection with a Maine federal, state, or local candidate election, it has engaged in lawful political expression within the State of Maine by means of cash payments and in-kind contributions to a Maine BQC named Maine Energy Progress ("MEP").

92.     Versant has also engaged in lawful political expression within the State of Maine by making lawful contributions or expenditures in connection with federal, state, or local elections of candidates as well as cash payments and in-kind contributions to MEP. Versant also engages in lobbying activities before the Maine Legislature.

93.     MEP was formed to oppose and defeat the citizen initiative entitled "An Act to Create the Pine Tree Power Company, a Nonprofit, Customer-owned Utility" (the "Pine Tree Power Initiative" or the "Initiative"), which appeared as "Question 3" on the November 2023 ballot along with the Act ("Question 2").

94.     Maine's voters rejected the Pine Tree Power Initiative. However, had the Initiative been approved, it would have created an entity that would acquire, by right of eminent domain, all of the assets of Maine's existing investor-owned electricity transmission and distribution utilities, including Versant.

95.     Versant and ENMAX's ability to actualize and express their political opposition to the

Pine Tree Power Initiative through the disbursement of cash and in-kind contributions to MEP was crucial to preserving and protecting Versant's very existence and ENMAX's property interest therein.

96.     ENMAX's disbursements of funds to MEP were made by means of international banking transactions originating in Calgary, Alberta, Canada, and terminating in Maine.

97.     No employee, office holder, or representative of the City was consulted or participated in any way with respect to ENMAX's decisions to make any of its cash payments or in-kind contributions to MEP.

98.     No employee, office holder, or representative of the City was consulted or participated in any way with respect to Versant's decisions to make any of its cash payments or in-kind contributions to Maine candidates, PACs, or to MEP.

99.     Supporters of the Pine Tree Power Initiative have indicated that they intend to continue to pursue their goal of a government takeover of Versant.

100.    ENMAX intends, in the future, to engage in political speech within the State of Maine with respect to referenda that affect the operations of its subsidiary Versant and/or Versant's customer ratepayers.

101.    Pursuant to the Revised Stipulation, the PUC Orders, the Resolution of the Sole Shareholder of ENMAX dated March 15, 2019, the Amended and Restated Unanimous Shareholder Agreement dated May 3, 2019, no employee, office holder, or representative of the City would be consulted or participate in any way with respect to any future decision by ENMAX to engage in political speech within the State of Maine with respect to referenda.

102.    Versant intends, in the future, to engage in political speech within the State of Maine with respect to candidate elections as well as referenda that affect its management, operations, and ability to serve its customer ratepayers.

103.    Pursuant to the Revised Stipulation, the PUC Orders, the Resolution of the Sole

Shareholder of ENMAX dated March 15, 2019, the Amended and Restated Unanimous Shareholder Agreement dated May 3, 2019, and Versant's Bylaws dated October 22, 2020, no employee, office holder, or representative of the City would be consulted or participate in any way with respect to any future decision by Versant to engage in political speech within the State of Maine with respect to referenda or candidate elections.

**COUNT I**
**On behalf of Versant and ENMAX**
**Declaratory Judgment and Injunctive Relief**
**(Violation of Supremacy Clause, Article VI, Clause 2, of the United States Constitution)**

104.     Plaintiffs repeat and reallege, as if set forth in full, each and every allegation of the preceding paragraphs of this Complaint.

105.     The Supremacy Clause of the United States Constitution provides that the "Constitution, and the Laws of the United States . . . , shall be the supreme law of the law of the land . . . anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

106.     The United States government has preeminent power with respect to the regulation of aliens within the country's borders, including their participation, *vel non*, in the electoral process.

107.     The United States government has exercised its authority in these fields by the enactment of FECA and the FEC's regulations pursuant thereto, which regulate political spending by foreign nationals in federal, state, or local elections.

108.     FECA expressly preempts any provision of State law with respect to election to Federal office. 52 U.S.C. § 30143. Likewise, the FEC's regulations expressly preempt and supersede state law concerning contributions and expenditures regarding federal candidates and political committees. 11 C.F.R. § 108.7(b)(3).

109.     FECA and its accompanying regulations also impliedly preempt state laws that conflict with FECA or stand as an obstacle to its accomplishment and execution of its full purposes and

objectives.

110.    FECA and its accompanying regulations preempt the Act because Congress has occupied the field of regulation of political speech by foreign nationals, leaving no room for state law to supplement it.

111.    Implementation and enforcement of the Act would cause Plaintiffs to suffer immediate and irreparable harm by foreclosing, upon the threat of administrative penalty and felony prosecution, their ability to continue engaging in political expression.

112.    There is an actual controversy between Plaintiffs and Defendants regarding the question of whether federal law, including FECA and its accompanying regulations, preempts the Act.

113.    Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that federal law, including FECA and its accompanying regulations, preempts the Act and a preliminary, and thereafter a permanent, injunction barring implementation and enforcement of the Act..

**COUNT II**
**Declaratory Judgment and Injunctive Relief**
**On behalf of Versant**
**(Violation of First and Fourteenth Amendments of the United States Constitution)**

114.    Plaintiff Versant repeats and realleges, as if set forth in full, each and every allegation of the preceding paragraphs of this Complaint.

115.    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

116.    The First Amendment to the United States Constitution applies to the Act and Versant by reason of the Fourteenth Amendment to the United States Constitution, which provides that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

117.    The forms of expression that the Act criminalizes are core political speech subject to the protections of the First and Fourteenth Amendments.

118.    Versant is entitled to these protections of the First and Fourteenth Amendments.

119.    The prohibitions on core political speech in the Act are not narrowly tailored to serve a compelling government interest, are not the least restrictive means of furthering that interest, nor are they closely drawn to serve a sufficiently important government interest.

120.    On its face, the Act's prohibitions and restrictions on domestic "foreign government-influenced entit[ies]" from engaging in core political speech within the State of Maine violate the First Amendment, made applicable to the states by the Fourteenth Amendment of the United States Constitution, because a substantial number of the Act's applications are unconstitutional, judged in relation to any legitimate portions of the Act.

121.    As applied to Versant, the Act's prohibitions and restrictions on Versant engaging in core political speech within the State of Maine, violate the First Amendment, made applicable to the states by the Fourteenth Amendment of the United States Constitution.

122.    Implementation and enforcement of the Act would cause Versant and all other non-alien entities that qualify as "foreign government-influenced entit[ies]"to suffer immediate and irreparable harm by the loss of their right to engage in core political speech.

123.    There is an actual controversy between Versant and Defendants regarding the question of whether the Act violates the First and Fourteenth Amendments of the United States Constitution.

124.    Versant is entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that the Act violates the First and Fourteenth Amendments of the United States Constitution and a preliminary, and thereafter a permanent, injunction barring enforcement of the Act..

## COUNT III
### Declaratory Judgment and Injunctive Relief
### On behalf of Versant
### (Violation of Article I Section 4 of the Maine Constitution)

125.    Plaintiff Versant repeats and realleges, as if set forth in full, each and every allegation of the preceding paragraphs of this Complaint.

126.    Article I, Section 4, of the Constitution of the State of Maine provides:

> **Section 4. Freedom of speech and publication; libel; truth given in evidence; jury determines law and fact.** Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty; no laws shall be passed regulating or restraining the freedom of the press; and in prosecutions for any publication respecting the official conduct of people in public capacity, or the qualifications of those who are candidates for the suffrages of the people, or where the matter published is proper for public information, the truth thereof may be given in evidence, and in all indictments for libels, the jury, after having received the direction of the court, shall have a right to determine, at their discretion, the law and the fact.

127.    The forms of expression that the Act criminalizes are core political speech subject to the protections of Article I, Section 4 of the Maine Constitution.

128.    Versant is entitled to the rights afforded by the Maine Constitution.

129.    The prohibitions on core political speech in the Act are not narrowly tailored to serve a compelling government interest, are not the least restrictive means of furthering that interest, nor are they closely drawn to serve a sufficiently important government interest.

130.    On its face, the Act's prohibitions and restrictions on domestic "foreign government-influenced entit[ies]" from engaging in core political speech within the State of Maine violate Article I, Section 4 of the Maine Constitution.

131.    As applied to Versant, the Act's prohibitions and restrictions on Versant engaging in core political speech within the State of Maine, violate Article I, Section 4 of the Maine Constitution.

132.    Implementation and enforcement of the Act would cause Versant and all other non-

alien entities that qualify as "foreign government-influenced entit[ies]" in Maine to suffer immediate and irreparable harm by the loss of their right to engage in core political speech.

133.    There is an actual controversy between Versant and Defendants regarding the question of whether the Act violates Article I, Section 4 of the Maine Constitution.

134.    Versant is entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that the Act violates Article I, Section 4 of the Maine Constitution and a preliminary, and thereafter a permanent, injunction barring enforcement of the Act.

## COUNT IV
### On behalf of Versant and ENMAX
### Declaratory Judgment and Injunctive Relief
### (Violation of the Foreign Commerce Clause of the United States Constitution)

135.    Plaintiffs incorporate by reference, as if set forth in full, each and every allegation of the preceding paragraphs of this Complaint.[1]

136.    The "Commerce Clause" of the United States Constitution provides that Congress shall have the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

137.    A state law can violate the "dormant" Foreign Commerce Clause by impeding the federal government's ability to speak with one voice in foreign affairs.

138.    The Act impedes the ability of the federal government to speak with one voice as to treatment of foreign governments' commercial activity in the United States.  A foreign government or a foreign government-owned entity's United States investments in business entities is treated differently by the Act in Maine than anywhere else in the nation, insofar as the Act prohibits any such "foreign-government influenced entit[ies]" from engaging in political speech in Maine.

139.    The Act, accordingly, violates the Foreign Dormant Commerce Clause by regulating

---

[1] ENMAX, however, is not bringing Counts II and III and thus does not reallege the paragraphs constituting those Counts.

how foreign entities and foreign governments may participate in electioneering in support of their commercial economic interests in the United States, including their ownership in domestic U.S. business corporations and entities.

140.    There is an actual controversy between Versant, ENMAX, and Defendants regarding the question of whether the Act violates the Foreign Commerce Clause of the United States Constitution.

141.    Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that the Act violates the Foreign Commerce Clause of the United States Constitution and a preliminary, and thereafter a permanent, injunction barring enforcement of the Act.

## Prayer for Relief

WHEREFORE, Plaintiffs, Versant Power and ENMAX Corporation, respectfully request that this Court enter judgment in their favor and against Defendants William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Stacey D. Neumann, and Dennis Marble, in their official capacities as members of the Maine Commission on Governmental Ethics and Election Practices, and Aaron Frey, in his official capacity as the Attorney General of the State of Maine, as follows:

(i)     Declaring that the Act violates Versant's rights under the First and Fourteenth Amendments of the United States Constitution;

(ii)    Declaring that the Act violates Versant's rights under Article I, Section 4 of the Constitution of the State of Maine;

(ii)    Declaring that the Act violates the Foreign Commerce Clause of the United States Constitution;

(iii)   Declaring that the Act is preempted by federal law including the Federal Election Campaign Act, 42 U.S.C. § 30121, and its accompanying regulations;

(iv)    Entering a preliminary and then permanent injunction enjoining implementation and enforcement of the Act;

(v)     Awarding Plaintiffs their attorneys' fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988(b); and

(vi)    Granting such other and further relief as the Court deems just and proper.

Dated: December 12, 2023                    Respectfully submitted,


                                            /s/Paul McDonald
                                            Paul McDonald
                                            John A. Woodcock III
                                            BERNSTEIN SHUR
                                            100 Middle Street
                                            P.O. Box 9729
                                            Portland, ME  04104
                                            207-774-1200
                                            pmcdonald@bernsteinshur.com
                                            jwoodcock@bernsterishur.com
                                            Counsel for Versant Power and ENMAX

**Verification**

      I, John Flynn, am the President of Versant Power and have authorized the filing of this complaint on its behalf.  I have reviewed the allegations in the complaint and, as to those allegations which I have personal knowledge, I believe them to be true.  As to those allegations which I do not have personal knowledge, I rely on my counsel and the investigations of my counsel and believe them to be true.

      Pursuant to 28 U.S.C. § 1746(2), I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  December 11, 2023                       /s/  John Flynn          
                                                John Flynn

**<u>Certificate of Service</u>**

The undersigned hereby certifies that on December 12, 2023, a copy of the foregoing

Verified Complaint For Declaratory and Injunctive Relief has been served, by e-mail, on the below

counsel for Defendants:


Johnathan Bolton, Esq.
Assistant Attorney General – Litigation Division
Maine Office of the Attorney General
jonathan.bolton@maine.gov

Paul Suitter, Esq.
Assistant Attorney General – Litigation Division
Maine Office of the Attorney General
Paul.Suitter@maine.gov

Dated: December 12, 2023                      <u>/s/ Paul McDonald</u>
                                              Paul McDonald
                                              Counsel for Plaintiffs Versant Power
                                              and ENMAX Corporation