**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

VERSANT POWER, and ENMAX CORPORATION,

Plaintiffs,

v.

WILLIAM J. SCHNEIDER, DAVID R. HASTINGS III, SARAH E. LECLAIRE, STACEY D. NEUMANN, and DENNIS MARBLE, in their official capacities as members of the MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, the MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, and AARON FREY, in his official capacity as ATTORNEY GENERAL OF THE STATE OF MAINE,

Defendants.

Civ. No.

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW**

BERNSTEIN SHUR
Paul McDonald
Jack Woodcock
100 Middle Street
P.O. Box 9729
Portland, ME 04104
207-774-1200
pmcdonald@bernsteinshur.com
jwoodcock@bernsteinshur.com

Attorneys for Plaintiffs Versant Power and ENMAX Corporation

**Preliminary Statement**

Plaintiffs Versant Power and its parent ENMAX Corporation move this Court for entry of a temporary restraining order and preliminary injunction enjoining the implementation and enforcement of "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution" (the "Act"),[1] which Maine's voters approved on November 7, 2023, and will become effective on January 5, 2024, to preserve the *status quo* pending a final adjudication of Plaintiffs' claims.[2]

For years, Plaintiffs have exercised their right to political speech, most recently on an issue which targeted Versant's very existence. Immediately after casting their vote on whether to approve the Act (Question 2), Maine's voters then turned to the next question on the ballot: Question 3, "An Act to Create the Pine Tree Power Company, a Nonprofit, Customer-owned Utility" (the "Pine Tree Power Initiative" or the "Initiative"). The Initiative would have created an entity designed to acquire, by right of eminent domain, all of the assets of Maine's existing investor-owned electricity transmission and distribution utilities, including Versant. Versant's very existence thus rested on the informed political judgment of Maine's voters. Of course, Versant and ENMAX spoke on this political issue. Plaintiffs' campaign spending included payments and in-kind contributions to a ballot question committee ("BQC") formed to oppose the initiative. Plaintiffs' political speech was effective; voters overwhelmingly rejected the Pine Tree Power Initiative.

If the proponents of the Initiative renew their efforts to seize Versant—which they have clearly indicated they will[3]—the Act would prohibit Plaintiffs from expressing their political voices to Maine voters through campaign spending. Furthermore, Plaintiffs stand ready to continue their paid

---

[1] A copy of the Act, 21-A M.R.S.A. § 1064 et seq. is attached hereto as Exhibit A.
[2] In further support of this Motion, Plaintffs' rely upon the allegations of their Verified Complaint ("Compl.") and the Declaration of Eric Fiegenbaum ("Feigenbaum Dec."), which are being filed simultaneously herewith.
[3] *See* Feigenbaum Dec. ¶¶ 4 – 10.

political expression with respect to any other future campaigns that affect their interests and those of their customers and other stakeholders. The Act, however, now makes all such spending a crime. It does so by banning the political speech of a new type of speaker—a "foreign government-influenced entity"—that would include Plaintiffs. Moreover, the Act requires government-mandated speech on issues that are not campaign-related but nonetheless involve public policy to be branded with the misleading label "sponsored by [a] foreign government-influenced entity."

Plaintiffs satisfy the standards for temporary and preliminary injunctive relief. The Act's discrimination against this type of speaker violates several provisions of the United States Constitution: including the Supremacy Clause, inasmuch as the Act is preempted by federal law; the First Amendment's right to freedom of speech and association; and the Dormant Foreign Commerce Clause. The Act further violates the Maine Constitution's right to free speech. The Act's abridgment of Plaintiffs' rights secured by the U.S and Maine Constitutions, by definition, constitutes irreparable harm. The balance of equities weighs in favor of the requested preliminary relief, which also would be in the public interest by preventing implementation and enforcement of an unconstitutional law pending final relief. Accordingly, the Court should grant the requested temporary restraining order and preliminary injunction.

## Legal Background

### A. Pertinent Provisions Of The Act

The Act defines a "foreign government-influenced entity" to include a "foreign government,"[4] a "foreign government-owned entity,"[5] and any entity in which a foreign government or foreign government-owned entity:

---

[4] A "foreign government" includes "any person or group of persons exercising sovereign *de facto* or *de jure* political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign *de facto* or *de jure* authority or functions are directly or indirectly delegated." Act § (1)(D).

[5] A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." Act § (1)(F).

> (i) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares
>
> (ii) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to entity's activities to influence the nomination or election of a candidate or the initiation or approval of a referendum

Act § (1)(E).

Subsection (2) of the Act bans a "foreign government-influenced entity" from making, "directly or indirectly…any donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." Act § (2).[6] Subsection (6) of the Act imposes an obligation upon each foreign government-influenced entity to affix a designated label to any other public communications made to influence (i) government policy, political or public interest or government policy or (ii) regarding the political or public interest or government relations with a foreign country or foreign political party. Act § (6). The mandated branding "must clearly and conspicuously contain the words 'Sponsored by' immediately followed by the name of the foreign government-influenced entity that made the disbursement and a statement identifying that foreign government-influenced entity as a 'foreign government' or a 'foreign government-influenced entity.'" Act § (6).

The Act empowers the Commission to impose a penalty for violations of the greater of $5,000 or double the amount of the donation or disbursement. Act § (8). A person who knowingly violates subsections (2) through (5) of the Act commits a Class C crime, which is punishable by up to five years' imprisonment. 17-A M.R.S. § 1604(1)(C); Act § (9).

[6] The Act adopts existing definitions of "contribution" and "expenditure" found at Title 21-A, thereby specifically banning any foreign government-influenced entity from making any "purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value" made for the purpose of influencing the nomination or election of any person to state, county or municipal office or for the purpose of initiating or influencing a campaign:" by a foreign government-influenced entity. Act §§ (1)(A) & (B).

## B. Pertinent Provisions Of Federal Law

### 1. FECA Expressly Bars Foreign Nationals From Political Spending On Candidate Elections

Under the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30121, and the regulations promulgated thereunder, "foreign nationals" are prohibited from a wide range of election activities. A "foreign national" includes an individual who is "not a citizen or national of the United States and who is not lawfully admitted for permanent residence" as well as "foreign principals," which include foreign governments, political parties, partnerships, associations, corporations, and organizations organized in a foreign country or having its principal place of business in a foreign country. 52 U.S.C. § 30121(6); 2 U.S.C. § 611. FECA prohibits these foreign nationals from: (i) making a contribution or donation of money or other thing of value (or promise to do so) in connection with a federal, state, or local election; (ii) contributing or donating to a committee of a political party; or (iii) making an expenditure, independent expenditure, or disbursement for an electioneering communication. 52 U.S.C. § 30121(a)(1). Regulations promulgated by the Federal Election Commission ("FEC") to implement FECA further provide that foreign nationals shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person or entity with regard to their federal or non-federal election-related activities, including the making of donations or disbursements in connection with elections for any federal, state, or local office or decisions concerning the administration of a political committee. 11 C.F.R. § 110.20.

Congress enacted FECA's expansive campaign spending restrictions in response to campaign donations made by foreign nationals in the 1996 election cycle. *Bluman v. F.E.C.*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011), *aff'd* 565 U.S. 1104 (2012) (Mem). After an extensive investigation, a U.S. Senate committee found that "foreign citizens had used soft-money contributions to political parties to essentially buy access to American political officials" and that the Chinese government had attempted to influence U.S. policies and elections by financing campaigns. *Id.* In response, Congress amended

FECA with the Bipartisan Campaign Reform Act of 2002 ("BCRA") which "expanded the ban on foreign nationals' financial influence on elections by banning foreign nationals from making expenditures and from making contributions to political parties." *Id* at 184.

**2. Congress Did Not Intend FECA To Prohibit Campaign Spending By U.S. Subsidiaries Of Foreign Principals**

In writing its final rules under the BCRA, the FEC "found no evidence of Congressional intent to broaden the prohibition on foreign national involvement in U.S. elections to cover U.S. subsidiaries of foreign corporations." FEC Ad. Op. 2006-15, at 3, req. by *TransCanada*. The FEC based this determination on "a lack of Congressional intent and on substantial policy reasons set forth in a long line of 'advisory opinions over more than two decades that have affirmed the participation of such subsidiaries in elections in the United States, either directly in states where state law permits, or through separate segregated funds with regard to Federal elections, so long as there is no involvement of foreign nationals in decisions regarding such participation.'" *Id.*

**3. FECA Does Not Bar Foreign National Spending On Ballot Initiatives**

Federal campaign finance restrictions have also long left the financing of ballot initiatives alone. Both before (FEC Ad. Op. 1989-32, req. by *McCarthy*) and after passage of the BCRA (FEC Ad Op. 2005-10, req. by Berman/Doolittle) the FEC has interpreted federal campaign finance law as inapplicable to ballot initiatives. And since 2021, Congress has considered, but not passed, legislation prohibiting foreign nationals from campaign contributions in connection with ballot initiatives. *See, e.g.*, Stop Foreign Interference in Ballot Measures Act, S.3136, 117th Cong.,; S. 1638 & H.R. 3463, 118th Congress.[7]

[7] This legislation sought to amend FECA to tack on "or State or local ballot initiative or ballot referendum" to the list of "Federal, State, or local elections" to which a foreign national cannot contribute or donate. *See id.*; 52 U.S.C. § 30121.

## Factual Background

### A. The Corporate Structure And Relationship Between Versant And ENMAX

The City of Calgary, Alberta, Canada (the "City") is the sole shareholder of ENMAX, a Canadian business corporation. Compl. ¶¶ 16, 58. ENMAX is a provider of energy services and products, which operates primarily through three business units: ENMAX Power, ENMAX Energy, and Versant.[8] *Id.* ¶ 59.

Versant, a Maine corporation formerly known as Emera Maine, is an electrical transmission and distribution utility that, in its present name and prior names, has operated continuously and exclusively within the State of Maine for more than ninety-nine years serving its customer ratepayers in northern and eastern Maine. *Id.* ¶ 62. In March 2020, an indirect ENMAX subsidiary, ENMAX US Holdco, Inc., acquired all of the common stock of Emera Maine, thus making Emera Maine an indirect subsidiary of ENMAX (the "Emera Maine Acquisition"). *Id.* ¶¶ 63-64. Two months later, Emera Maine changed its name to Versant Power. *Id.* ¶ 65.

### B. The Absence Of Foreign Government Influence Over Versant's Operations, Management, Or Governance

Notwithstanding its ownership of the stock of ENMAX, the City has no decision-making authority over, or even the ability to participate in, the operations or management of ENMAX or the operations, management, or governance of Versant. Compl. ¶ 66. To the contrary, the City is expressly prohibited from doing so. *Id.*

The Emera Maine Acquisition was subject to approval by, among others, the Maine Public Utilities Commission (the "PUC"). Compl. ¶ 67. In considering whether to approve the Emera Maine Acquisition, the PUC was required by 35-A M.R.S. § 708(2)(C)(2) to examine whether the transaction

---

[8] ENMAX Power is an electrical transmission and distribution utility that operates electrical infrastructure within the City of Calgary. ENMAX Energy is an electricity and natural gas provider and wholesale electricity generator that operates within the Province of Alberta, Canada.

would "result in a loss of local control of the utility's management and operations in a manner that limits the ability of local management to protect the interests of the utility's ratepayers in [Maine]." 35-A M.R.S. § 708(2)(C)(2); Compl. ¶ 74. The PUC and certain interested parties expressed concern that because ENMAX US Holdco, Inc. (the entity that would be acquiring Emera Maine), was the subsidiary of a Canadian corporation (ENMAX) whose stock was wholly owned by a foreign government shareholder (the City), Emera Maine's operations ultimately would be subject to control by a foreign company and a foreign government. Compl. ¶ 75. To address these concerns regarding local control, ENMAX, ENMAX US Holdco, Inc., the Public Advocate, and other interested parties entered into a Stipulation that placed limitations and conditions on the operations, management, and governance of ENMAX and Emera Maine to ensure that the City has no ability whatsoever to participate in the operations or management of ENMAX or the operations, management, or government of Emera Maine. *Id.* ¶¶ 77-79.

Based, in part, on these provisions of the Stipulation concerning local control, the PUC formally approved the Emera Maine Acquisition by Orders dated March 19, 2020 and April 21, 2020 (together, the "PUC Orders"). Compl. ¶ 80. Among other things, the PUC Orders expressly incorporate the terms of the Stipulation. *Id.* The requirements of the PUC Orders and Stipulation ensuring that the City has no decision-making authority or even the right to participate in the operations or management of ENMAX or the operations, management, or governance of Versant are further embodied in certain of ENMAX's and Versant's corporate documents. *Id.* ¶¶ 81-82.

### C. Plaintiffs' Political Spending

Both Plaintiffs have made in-kind donations and disbursements of funds to a BQC. Compl. ¶¶ 5, 91. In addition, Versant has made in-kind donations and disbursements of funds to political action committees ("PACs") in connection with candidate elections. *Id.* ¶ 5. Plaintiffs wish to continue expressing their political views on matters that affect Versant and its employees, customers,

and other stakeholders by making in-kind donations and disbursements of funds to BQCs. *Id.* ¶¶ 6, 100, 102. Versant also wishes to continue doing so by making in-kind donations and disbursements of funds to PACs. *Id.* ¶¶ 6, 102.

**Applicable Legal Standards**

The standards for issuance of a temporary restraining order or a preliminary injunction are well known to the Court:

> To obtain preliminary injunctive relief, whether a temporary restraining order or a preliminary injunction, the plaintiff must demonstrate: 1) 'a likelihood of success on the merits, 2) a likelihood of irreparable harm [to the movant] absent interim relief, 3) a balance of equities in the plaintiff's favor, and 4) [that the preliminary injunctive relief would be in] service of the public interest.'

*Doe on behalf of Doe v. Portland Pub. Sch.*, No. 2:23-CV-00409-JAW, 2023 WL 7301072, at *10 (D. Me. Nov. 3, 2023) (citing *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F. 3d 168, 171 (1st Cir. 2015)). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18, (1st Cir. 2006). The first two factors, likelihood of success on the merits and irreparable harm, "are the most important and, in most cases, 'irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.'" *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citing *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)).

**Argument**

**A. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims**

Plaintiffs are likely to succeed on the merits of their claims because the Act violates the Supremacy Clause, the First and Fourteenth Amendments, and the Dormant Foreign Commerce Clause of the United States Constitution. The Act similarly violates the Maine Constitution.[9]

[9] "With respect to the protection of freedom of speech, the Maine Constitution is no less restrictive than the Federal Constitution." *City of Bangor v. Diva's, Inc.*, 2003 ME 51, ¶ 11, 830 A.2d 898 (quotation marks omitted). Because the Act

**1. The Act Is Preempted By Federal Law And Infringes Upon The Federal Government's Right To Conduct Foreign Affairs**

**a. Federal Preemption Standards**

The doctrine of preemption is rooted in the U.S. Constitution's Supremacy Clause: where a state statute conflicts with, or frustrates federal law, it must give way. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). Federal preemption of state law "may be either expressed or implied." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). If a federal statute does not expressly preempt state law, preemption may nonetheless be "implied" in two ways. *Id.* First, "field preemption" applies if the "scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (internal quotes omitted). Second, "conflict preemption" applies if compliance with both federal and state law is impossible or state law "stands as an obstacle to the accomplishment and execution" of Congress's objectives. *Id.* (citations omitted). A court's "ultimate task" in a preemption analysis is "to determine whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole." *Id.* Accordingly, in analyzing whether a state law is preempted, the federal and state laws must be compared to find if and how they are in opposition.

**b. The Act's Restrictions On Federal Candidate Election Spending Are Expressly Preempted By FECA**

FECA contains an express preemption provision which states that it shall "supersede and preempt any provision of state law with respect to election to federal office." 52 U.S.C. § 30143.[10] Importantly, this provision "replaced a prior provision that included a savings clause, expressly preserving state laws, except where compliance with state law would result in a violation of FECA or

violates the First Amendment's protection of freedom of speech, it also runs afoul of Article I Section 4 of the Maine Constitution.

[10] Likewise, an FEC regulation provides that "federal law supersedes State law concerning the … (3) Limitations on contributions and expenditures regarding federal candidates and political committees." 11 C.F.R. § 108.7(b)(3) (2023).

would prohibit conduct permitted by FECA." *Teper v. Miller*, 82 F.3d 989, 994 (11th Cir. 1996).

FECA squarely defines which foreign entities may not participate in the federal election process: it bans "foreign nationals," including "foreign principals," from directly or indirectly contributing or donating money in connection with a federal, state, or local election. 52 U.S.C. §§ 30121(a), (b). FECA does not restrict campaign spending based on an entity's alleged "government influence." *Id.* But the Act does. It imposes a different standard from FECA—whether the entity qualifies as a "foreign government-owned entity" or "foreign government-influenced entity"—for determining whether an entity (domestic or foreign) is barred from making campaign contributions, expenditures, and independent expenditures in federal elections. Act §§ (1)(E), (2).

The express preemptive language, in both FECA and its accompanying regulations, demonstrates that Congress intended to pre-empt state law regarding campaign contributions and expenditures in federal elections. In these circumstances, the Act must give way to FECA. *See* U.S. Cons., Art. VI, cl. 2; *Medicaid and Medicare Advantage Products Ass'n of P.R., Inc. v. Emanuelli*, 58 F.4th 5, 14 (1st Cir. 2023) (finding state law preempted by Medicare Advantage Act's express preemption clause).

**c. FECA Impliedly Preempts The Act Because The Act Conflicts With Congress's Framework For Eliminating Foreign Influence In U.S. Elections**

The Act is purportedly aimed at staunching foreign governments from influencing U.S. elections. But, Congress already addressed that issue, following a thorough Senate investigation and a nearly 10,000-page report, *see* S. Rep. 105-167, by expanding FECA's prohibition of campaign involvement by foreign nationals. *Bluman*, 800 F. Supp. 2d at 284. By any measure, this prohibition is broad, preventing foreign nationals (all foreign citizens except lawful permanent U.S. residents) from contributing or donating to any federal, state, or local election, or making any expenditure to advocate for a political candidate. 52 U.S.C. § 30121; *Bluman*, 800 F. Supp. 2d at 281. These prohibitions also

apply to virtually all foreign entities: governments, corporations, political parties, partnerships, and associations. 22 U.S.C § 611(b) (defining "foreign principal"). Congress, however, did not cast this sweeping prohibition so wide as to ensnare domestic U.S. corporations and U.S. subsidiaries of foreign corporations. As the FEC has determined, Congress showed no intent to prohibit domestic corporations from making campaign contributions and expenditures, so long as foreign nationals are not involved in how such campaign spending is conducted. Contributions, Limitations, and Prohibitions 67 Fed. Reg. 69928 (Nov. 19, 2002) at 69943.

Thus, the Act contravenes the scope of restrictions the federal government has placed on foreign nationals' involvement in U.S. elections. Under the Act, countless private and public U.S.-based corporations or organizations who could otherwise contribute to or make expenditures in support of candidates for federal, state, and local elections in Maine are automatically prohibited from doing so if a foreign government-owned entity holds more than 5% of their total equity. Act §§ (1)(E), (2). Such entities are not "foreign nationals" or "foreign principals," as defined under the BCRA, but subject to the same ban on election activities in Maine as if they were. Under the BCRA, U.S. entities, citizens, and lawful permanent residents retained the right to fully participate in the U.S. campaign process; it is only foreign nationals and principals who are outright banned from doing so. This objective is effectively undermined by the Act.

In legislating to prevent foreign influence in elections, Congress also stopped short of regulating contributions and expenditures in connection with ballot initiatives. Accordingly, foreign principals, including foreign corporations, are not prohibited under FECA from making contributions or expenditures in connection with ballot initiatives. Ballot initiatives are not "elections" as defined under FECA and thus are free from the Act's restrictions. Federal Election Commission, MUR 7523, October 4, 2021.[11] In drawing this line, "Congress could reasonably

[11] MUR 7523 is available at https://www.fec.gov/files/legal/murs/7523/7523_23.pdf

conclude that the risk of undue foreign influence is greater in the context of candidate elections than it is in the case of ballot initiatives." *Bluman*, 800 F. Supp. 2d at 291. This conclusion has deep roots. For decades, the Supreme Court has noted that FECA regulates only candidate elections, but not ballot initiatives. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995); *Citizens Against Rent Control v. City of Berkeley, Cal.*, 454 U.S. 290 (1981); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). FECA has been amended since then, and "Congress is presumed to be aware of… judicial interpretation of [the] statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1987).

Considering this history, the void of federal regulation concerning foreign nationals' ability to donate and make disbursements regarding ballot measures should be viewed as Congress's considered choice, not an inadvertent hole meant to be filled by state regulation. "Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens." *Bluman*, 800 F. Supp. 2d at 291. Congress has long allowed foreign nationals and principals to make contributions and expenditures in U.S. ballot measures. The failure to regulate such activities by foreign nationals is by legislative design.

The Act, however, is to the contrary. It restricts entities with 5% foreign-government ownership (direct or indirect) from spending monies or making donations in connection with ballot measures. In so doing, the state law stands in the way of the purpose and objectives of Congress in regulating foreign influence in U.S. elections. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Therefore, the Act is preempted by FECA and its accompanying regulations.

#### d. Preemption Is Especially Appropriate Because The Act Conflicts With The Nation's Foreign Policy

The Act directly conflicts with the nation's policy of determining how foreign citizens may participate in the U.S. election process. In this arena, Congress has a particularly strong interest in preempting state law. "[P]reemption is much more easily found when Congress has passed legislation

relating to foreign affairs." *Nat'l Foreign Trade Council v. Natsios*, 181 F. 3d 38, 74 (1st Cir. 1999). The notion that Congress might lack the authority to distinguish foreigners from citizens in the regulation of electioneering would certainly have surprised the Framers, whose "obsession with foreign influence derived from a fear that foreign powers and individuals had no basic investment in the well-being of the country." *Citizens United v. F.E.C.*, 558 U.S. 310, 425 n.51 (2010) (Stevens, J. dissenting). Indeed, "[i]t is long established that the government's legislative and regulatory prerogatives are at their apex in matters pertaining to alienage." *Bluman*, 800 F. Supp. 2d at 290.

Through FECA, Congress has defined the composition of the community that may participate in electioneering, expressly excluding foreign nationals and foreign principals. The Act, however, draws a different line entirely. On the one hand, the Act focuses on a narrower class of foreigners—foreign governments. Act § (1)(D). On the other hand, the Act has a much broader reach that encompasses domestic corporate subsidiaries with nominal foreign-government ownership interests. *Id.* § (1)(E). The Act redefines how one state of fifty regulates the political speech of foreign governments and their business interests. This state-specific regulation of foreign affairs is contrary to the federal government's exclusive foreign policy domain. "It was one of the main objects of the Constitution to make us, so far as regarded our foreign relations, one people, and one nation." *Holmes v. Jennison*, 39 U.S. 540, 575 (1840).

In confronting the same issue addressed by Congress years ago in the BCRA—foreign interference in U.S. elections—the Act comes up with a different policy response which re-defines the scope of the foreign prohibition on electioneering in the United States and recasts how foreign nationals and principals may participate in the U.S. electoral process. But it is "[t]he Federal Government, representing as it does the collective interests of the [ ] states, [that] is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." *Hines*, 312 U.S. at 63. FECA's regulation of what foreign nationals and principals may and may not do in U.S.

elections preempts the Act's foray into re-orienting how foreign sovereignties and their U.S. investments may participate in U.S. elections. *See id; Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) ("Under conflict preemption, a state law must yield when it conflicts with an express federal foreign policy") (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003)).

The Act's conflict with the consistent foreign policy embedded in FECA's prohibition of foreign nationals' participation in electioneering underscores its preemptive effect. The doctrine of preemption is easily found when Congress decides to regulate foreign affairs. *See Natsios*, 181 F. 3d at 74. Where, as with the Act, "state legislation will produce something more than an incidental effect in conflict with express foreign policy of the National Government … require[s] preemption of the state law." *Garamendi*, 539 U.S. at 419.

**2. The Act Facially Violates The First Amendment By Abridging Freedom Of Speech And Association**

"The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office." *F.E.C. v. Cruz,* 596 U.S. 289, 302 (2022) (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971)). For years, domestic corporations and entities have been able to exercise their First Amendment rights by contributing to candidates and adding to the information voters consider in exercising their judgment as to whether to adopt a policy through a ballot measure. The Act, however, makes such speech a crime for all who meet the Act's definition of "foreign-government-influenced entity." Act § (8). The First Amendment protects against this abridgement of the freedom of speech and association.

**a. Strict Scrutiny Applies To A Total Ban On Contributions And Expenditures**

The Supreme Court typically uses one level of scrutiny—"closely drawn"—to apply to laws limiting campaign contributions and another level—"strict"—to apply to independent expenditures. *See McConnell v. F.E.C.*, 540 U.S. 93, 134 – 141 (2003), overruled on other grounds by *Citizens United*

*v. F.E.C.,* 558 U.S. 310 (2010). The Act effectively bans "foreign government-influenced entit[ies]" from making both contributions and expenditures. Act § (2). In this case, however, strict scrutiny applies to all the Act's campaign spending restrictions.

In *Buckley*, the Supreme Court applied closely drawn scrutiny to a state law placing *limits* on campaign contributions because contribution limits, unlike the limits on expenditures, "entai[l] only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley v. Valeo,* 424 U.S. 1, 20 (1976), (superseded by statute).[12] Here, however, the Act outright prohibits all campaign contributions by a "foreign government-influenced entity." Likewise, the Supreme Court has applied strict scrutiny to state laws that, like the Act, regulate speech based on the speaker's identity. *Citizens United*, 558 U.S. at 341; *Bellotti*, 435 U.S. at 784–85. And the Court has consistently applied strict scrutiny to regulations curtailing independent expenditures. *F.E.C. v. Wisconsin Right to Life, Inc.*, ("WRTF") 551 U.S. 449, 452 (2007); *McConnell v. F.E.C.,* 540 U.S. 93, 205 (2003); *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 655 (1990), overruled on other grounds by *Citizens United*, 558 U.S. at 365 – 66).

This precedent forecloses using a more deferential standard of review to examine the Act. *See Citizens United,* 558 U.S. at 341; *but see Bluman*, 800 F. Supp. 2d at 286 (noting—without deciding the issue—that determining the level of scrutiny to apply to a law that implicated foreign affairs and the First Amendment was "complex."). Strict scrutiny thus applies to the Act's ban on campaign contributions and expenditures. To meet this standard, "the Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest." *McCutcheon v. F.E.C.*, 572 U.S. 185 197 (2014); *WRTF,* 551 U.S. at

[12] The Court so reasoned because a "contribution serves as a general expression of support for the candidate . . . but does not communicate the underlying basis of support." *Id.* at 21. The size of a contribution is only a rough proxy for a contributor's support for the candidate. *Id.* Therefore, limits on the amount of money a contributor gives to a candidate or campaign organization "involve[] little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by the contribution … ." *Id.*

464 – 65 ("Under strict scrutiny, the *Government* must prove that applying BCRA to [campaign] ads furthers a compelling governmental interest and is narrowly tailored to achieve that interest.").

**b. Defendants Have The Burden Of Demonstrating The Government's Compelling Interest In Limiting Foreign Government-Influenced Speech In U.S. Elections**

Apart from the question of what level of scrutiny applies, "the Government must prove at the outset that it is in fact pursuing a legitimate objective." *Cruz*, 596 U.S. at 305. And ultimately it is the Government's burden to prove the constitutionality of its actions when it restricts speech. *McCutcheon*, 572 U.S. at 210.

There is but one "legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *Id.* at 206. The Supreme Court has rejected restrictions on campaign speech to achieve other policy objectives. *Id.* at 207. "No matter how desirable it may seem, it is not an acceptable governmental objective to 'level the playing field' or to 'level electoral opportunities' or to 'equalize the financial resources of candidates.'" *Id.* Indeed, the concept the government may "restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Id.* (citing *Buckley*, 424 U.S. at 48 – 49).

The Supreme Court has not directly addressed whether the government has a compelling interest in preventing foreign nationals from influencing American elections. *Citizens United*, 558 U.S. at 362 ("We need not reach the question of whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process.") At least one court has, in *dictum*, suggested such a compelling interest. In *Bluman*, the district court noted that "preventing foreign influence over the U.S. Government was a "compelling interest that justifies *Congress*[13] in restraining foreign nationals' participation in American elections … ." *Blumen,* 800 F.

[13] *See* Argument, § A(1)(a), *supra*.

Supp. 2d at 290 (emphasis added).

But, as with much in regulating political speech, there is a countervailing interest. The Supreme Court has recognized that a U.S. citizen has the right to not have the government restrain particular views or particular speakers on a subject. "It is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 558 U.S. at 341. The Court has reiterated that a law cannot stand that favors certain identified preferred speakers. *Id.* at 340. "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *Bellotti*, 435 U.S. at 784.

Resolving the tension between these interests is unnecessary here. Even if the government has a compelling interest in limiting foreign-government speech in U.S. elections, the Act is not close to being narrowly tailored to that interest. *See WRTL*, 551 U.S. at 464 – 65.

### c. The Act Is Not Narrowly Tailored To The Interest In Restricting Foreign-Government Speech In U.S. Elections

#### i.) The Act Does Not Advance The Prevention Of *Quid Pro Quo* Corruption Or Its Appearance

The Act violates the First Amendment because there is no legitimate government objective in restricting "foreign government-influenced" speech in the Act's blunderbuss manner. The only legitimate objective the Supreme Court has upheld as a ground for restricting political speech is the "prevention of *'quid pro quo'* corruption or its appearance." *See Cruz*, 596 U.S. at 291. "That Latin phrase captures the notion of a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192. But foreign nationals cannot engage in this exchange; they already are prevented from contributing to local, state, and federal candidates, as explained *supra.* 52 U.S.C. § 30121. On top of that, foreign nationals are also banned from making independent expenditures in those elections. *Id.*

Equally important, ballot initiatives simply do not invoke the specter of *quid pro quo*

corruption. Aside from being paid to vote, which is already illegal, 18 U.S.C. § 597, a voter cannot exchange any official act for money in rendering a political decision on a ballot initiative. A ballot initiative voter has nothing to give in a *quid pro quo* arrangement. *See Citizens Against Rent Control*, 454 U.S. at 300 (Blackmun, J. and O'Connor, J. concurring) ("curtailment of speech and association in a ballot measure campaign, where the people themselves render the ultimate political decision cannot be justified on [the] basis [of preventing corruption]"). Similarly, the *Citizens United* Court concluded that independent expenditures on issues "do not give rise to corruption or the appearance of corruption." *Citizens United,* 558 U.S. at 357.

Accordingly, the Act does not further the interest of preventing *quid pro quo* corruption because federal law already prohibits foreign nationals from making contributions and expenditures in local, state, and federal elections and funding of ballot measure advocacy does not implicate *quid pro quo* corruption. In light of the existing federal proscription of foreign contributions to candidates, any assertion here of an anticorruption interest must be met with "a measure of skepticism." *Cruz*, 596 U.S. at 306. The Act sits in "yet another long line of prophylaxis-upon-prophylaxis approaches to regulating campaign finance." *Id.* (cleaned up). Federal law already prevents foreign nationals from contributing or spending money to influence candidate elections. And State and federal laws limit contributions to candidates in any event. *See* 52 U.S.C. § 30116(a)(1)(A); 88 Fed. Reg. 7088; 21-A M.R.S. § 1015. Such contributions must also be disclosed. *See* 52 U.S.C. §§ 30104(b)(3)(A), (c)(1); Act. These restrictions "are themselves prophylactic measures, given that few if any contributions to candidates will involve *quid pro quo* arrangements." *Cruz*, 596 U.S. at 306 (quotation marks omitted). Taken as a whole, this shield on top of shield approach "is a significant indicator that the [Act] may not be necessary for the interest it seeks to protect." *Id.* 306 – 07.

Such is the case here. There is little, if any, evidence that foreign governments are skirting existing laws to influence U.S. elections to a degree that warrants further restriction of First

Amendment rights. Federal courts have upheld the conviction of a foreign national who made campaign contributions in violation of FECA. *See United States v. Singh*, 979 F.3d 697, 709 – 712 (9th Cir. 2020). And recently, the campaign of the mayor of a major American city is reported as being investigated by the F.B.I. for possible illegal contributions from a foreign government and foreign nationals.[14] Plaintiffs are aware of no evidence to suggest that the BCRA, which Congress enacted directly in response to reports of foreign and foreign-government interference in U.S. elections, is not working as intended. Indeed, if there is an instance of foreign-government *quid pro quo* corruption in a Maine election, or election in the United States more broadly, that slipped through the existing federal barriers, it was not broadcast in the campaign leading to the vote on the Act.

Because the government is defending the speech restrictions in the Act "necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured." *Cruz,* 596 U.S. at 307 (citation omitted). Rather, it must point to "record evidence" demonstrating the need to address the problem. *Id.* Conjecture cannot carry a First Amendment burden. *Id.* Here, there is no legislative record supporting the Act because it was enacted not by the Legislature but by the people. And in the absence of such a record, there is scant, if any, evidence of unchecked foreign government *quid pro quo* corruption writ large.

There is even less support (of record and as a matter of logic) for the Act's seeking to root out "foreign government influence" in domestic corporations with foreign investors, particularly at the minimal level of ownership (5%) used in the Act. The public record appears devoid of any instance where a U.S. corporation or entity with such a *de minimus* foreign government ownership has acted as a vehicle to facilitate a foreign government *quid pro quo* with a public official.

[14] *See* Emma Fitzsimmons and Michael Rothfeld, Did Fake Donors Give the Mayor Real Money? The F.B.I. Wants to Know, New York Times (Nov. 4, 2023), https://www.nytimes.com/2023/11/04/nyregion/eric-adams-straw-donor-scheme.html; Sam Cabral, Eric Adams: FBI Seize NYC Mayor's Phones In Fundraising Investigation, BBC (Nov. 10, 2023), https://www.bbc.com/news/world-us-canada-67387473

At bottom, the Act is a medicine far too strong for a posited affliction. *See Cruz*, 596 U.S. at 307; *Colorado Republican Federal Campaign Committee v. F.E.C.*, 518 U.S. 604, 618 (1996). The abridgement of First Amendment rights requires actual evidence of the ills which free-speech restrictions supposedly treat. *Id.*

**ii.) The Act's Five-Percent Foreign Ownership Standard Does Not Equate To Influence Over A Corporation**

The Act's declaration that minimal foreign-government or foreign government-owned entity ownership of an entity results in *de facto* foreign-government influence over that entity's political speech is not narrowly tailored. This is particularly true as applied to for-profit corporations. Although corporate structure varies, in the familiar corporate organization in which the owners (shareholders) are distinct from the officers, managers, or directors, ownership is a poor proxy for influence. Indeed, as Justice Stevens noted in *Citizens United*, shareholders as a group are not the answer to the question of "who" is speaking when a business corporation spends money on political activity. "[S]hareholders, who tend to be far removed from the day-to-day decisions of the firm and whose political preferences may be opaque to management" "cannot be realistically be said" to be the mouthpiece of corporate political speech. *Citizens United*, 558 U.S. at 467 (Stevens, J. concurring, in part, and dissenting, in part).

In the domain of corporate political spending, if a five-percent shareholder has any voice at all it is an insignificant one. Such a shareholder, standing alone, does not have the power to elect the board of directors, implement changes in the corporate governing documents, or direct how the corporation spends money. *C.f. Bellotti*, 435 U.S. at 794 (noting shareholders' rights to elect board, insist on protective provisions in corporate charter and generally "protect their own interest."). Moreover, the most powerful remedy a minority shareholder possesses, a derivative suit, would be

largely toothless to alter lawful discretionary campaign spending.[15] That is because the "internal authority wielded by boards and managers" to make decisions about how to make campaign contributions and expenditures falls clearly within the "expansive protections afforded by the business judgment rule." *Bellotti*, 435 U.S. at 467 – 77; *c.f. Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 763 (3d Cir. 1974) (finding business judgment rule did not protect directors' decision to make contribution in violation of federal law); *see also*, *Fletcher Cyclopedia of the Law of Corporations*, § 2940 (2023) ("it would seem reasonable to assume that a corporate expenditure for lawful political purposes is within corporate powers and within the authority of the board of directors, at least if a reasonably direct benefit to the corporation can be expected.").

The Act is not targeted at the locus of a business corporation's decision-making power on political spending: its board and management. In aiming to combat foreign government influence based upon *de minimus* ownership share, the Act misses the mark. Its errant restrictions are not narrowly tailored to the interest of limiting foreign-government influence in Maine's elections.

**iii.) <u>The Act's Five-Percent Equity Test Is Overinclusive</u>**

By sweeping up corporations that have five-percent foreign ownership, the Act is overbroad and not remotely tailored to the interest of limiting foreign governments in influencing elections. The U.S. Treasury recently reported that Foreign Official Investors, "consisting primarily of foreign national government institutions involved in the formulation of monetary policy, such as central banks, but also. . .national government-owned investment funds, including sovereign wealth funds, and other national government institutions owned $1.29 trillion in U.S. equities. *See* Department of Treasury, Foreign Portfolio Holdings of U.S. Securities, April 2023, at 7 n.9 & Ex. 9. Such institutions would almost certainly fall within the Act's definition of "Foreign Government." *See* Act § (D).

---

15 Any such action by a foreign-government shareholder would be met with great skepticism about whether corporate, rather than national, interests formed the true basis of the lawsuit.

Given the massive amount of foreign investment in the United States, public and private corporations with a Maine presence will undoubtedly be subject to the Act's ban on political spending. It bears repeating that such companies' campaign-related speech would be restricted without any record evidence that such foreign-government ownership actually influenced corporate political spending. In short, the Act sweeps too broadly to restrict companies with nominal foreign-government ownership from political speech. For this additional reason, it is not narrowly tailored.

**iv.) The Act Is Underinclusive**

Although the Act is overinclusive, it is also underinclusive. *See Citizens United*, 558 U.S. at 362. The Act targets foreign influence over both candidates and ballot initiatives, yet "foreign government -influenced" entities, such as Versant, can lawfully employ lobbyists to influence the actual votes of public officials on legislation.[16] Thus, "the under-inclusiveness of the statute is self-evident. [Foreign government-influenced] expenditures with respect to referendum are prohibited, while corporate activity with respect to the passage or defeat of legislation is permitted, even though corporations may engage in lobbying more often than they take positions on ballot questions submitted to the voters." *Bellotti,* 435 U.S. at 793. In light of this under-inclusiveness, the government cannot meet its burden of proving that the Act is narrowly tailored to further a compelling governmental interest. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015).

**d. The Act Will Chill Speech**

"First Amendment freedoms need breathing space to survive." *WRTL*, 551 U.S. at 468–69 (quoting *NAACP v. Button,* 371 U.S. 415, 433 (1963)). The Act's five-percent ownership threshold, coupled with the threat of criminal prosecution for campaign spending if this threshold is passed,

[16] A "foreign government influenced" entity may lobby a Maine legislator considering her vote on a proposed law. *See* Compl. ¶ 92. But those same entities could not spend money to reach a Maine voter considering her vote on what may be the same law. Take, for instance, the Act itself which the legislature passed; the Governor vetoed; and the voters then approved, *see* Me. Const. art. IV, pt. 3, § 18, cls. 2; *see also* Compl. ¶¶ 30–36.

will unquestionably chill corporate speech. *See* Act §§ 1(E)(2), 8. This is particularly so for a publicly held corporation. Before making any campaign contribution or expenditure, such a corporation would have to check if any foreign government or foreign government-owned entity held more than 5% of its stock. This is no small task. A "partial" list of major foreign official institutions which have come to the attention of the Federal Reserve Banks and the Department of the Treasury published in 2022 spans nearly forty pages.[17] And these foreign-government entities' percentage of ownership may vary day by day, and in ways no way controlled by the corporation.

Faced with the burden of determining which of its investors are arms of foreign governments and then tracking, on any given day, if any such investor has a five-percent ownership stake, a corporation may reasonably choose to stay silent and not engage in electioneering. This is particularly true considering the Act's imposition of both criminal and civil penalties. *See* The Act §§ 1604(8), (9). Moreover, the bad publicity and attendant reputational damage—to the candidate, cause, and corporation—that would come with a later finding that electioneering activity was illegally conducted and the attendant label of "foreign government-influenced entity" could dissuade many corporations, whose goodwill is paramount, to avoid this risk altogether. And "even minor punishments can chill protected speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). In short, the prospect of a criminal conviction, fines, and flak, may cause image-conscious companies to forfeit their First Amendment rights. The Constitution guards against this outcome, providing "protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Id.*; *Riley v. Nat'l Federation of the Blind of N.C.*, 487 U.S. 781, 794 (1988) ("This scheme must necessarily chill speech in direct contravention of the First Amendment's dictates.").

---

[17] *See* U.S. Treasury, List of Certain Foreign Institutions Classified as Official for Purposes of Reporting on the Treasury International Capital (TIC) Forms, Revised Nov. 2022, https://ticdata.treasury.gov/resource-center/data-chart-center/tic/Documents/foi-Nov2022.pdf.

**e. The Act's Alternative Measure For Foreign Government Influence Is So Vague That It Would Stifle Speech**

For all the fatal problems with a five-percent test to determine whether an entity is "foreign government-influenced," at least it is a bright line. The same cannot be said of the Act's other measure. A "foreign government-influenced entity" can be so deemed in a much more subjective manner as well. The Act also provides that an entity may be "foreign government-influenced" if a foreign-government (or foreign government-owned entity) "directly or indirectly participates in the decision making process" regarding any campaign or ballot initiative spending activities. Act § (E)(2)(b). This standard is but a fog. Does a foreign-government investor monitoring earnings calls which outline upcoming political spending "indirectly participate" in the decision to spend that money? What if a foreign government shareholder chimes in on a discussion about whether to oppose a ballot measure at an annual shareholders' meeting? Or votes on a shareholder proposal regarding political spending? The Act's ban on "indirect participation" is wholly vague and, within the corporate context where financial activity is largely disclosed and subject to discussion, could apply to all but the most passive investor.

A restriction on free speech must not be so unclear. Rather, it "must eschew the open-ended rough-and-tumble of factors which invites complex argument in the trial court and a virtual inevitable appeal." *WRTL*, 551 U.S. at 451. A standard must be devised that allows for little, if any, discovery and "allows parties to resolve disputes quickly without chilling speech." *Id.* Simply put, "vague" laws chill speech. *See Citizens United,* 558 U.S. at 324. A corporation with a foreign government investor that owns but a small slice of the company should not have to fret about what level of shareholder participation makes it a "foreign government-influenced entity." *See* Act § 1(E)(2)(B). Nor should a

contested shareholder resolution touching upon political spending[18] raise the prospect that the corporation itself is then prohibited from engaging in core political speech. Determining whether a foreign government or foreign government-owned entity "directly or indirectly participates," *id.*, "itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Citizens United,* 558 U.S. at 327. "First Amendment standards, however, "must give the benefit of any doubt to protecting rather than stifling speech." *Id.*

At bottom, the Act imposes unjustified restrictions on core political speech and further stifles legitimate speech because of its overbreadth and vagueness. As shown above, "a substantial number of [the Act's] applications are unconstitutional," particularly when judged in relation to its "legitimate sweep" (if any) and is therefore facially invalid as a result. *See Am. For Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2387 (2021). *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 131 (2011) (Scalia, J. concurring) ("And if the statute imposes unjustified burdens on speech or association protected by the First Amendment, or if it operates to chill or suppress the exercise of those freedoms by reason of vague terms or overbroad coverage, it is invalid.").

**f. The Act Compels Speech In Violation Of The First Amendment**

The Act seeks to regulate more than just electioneering. Section six of the Act mandates a proscribed disclosure if a "foreign government influenced entity" finances a "public communication" aimed to influence the public, a state or local official, or an agency regarding public policy or foreign policy. Act § 6. Such a communication "must clearly and conspicuously contain the words 'Sponsored by'" followed by the name of the entity and a statement identifying that entity as a "foreign government" or a "foreign government-influenced entity." *Id.*

---

[18] A recent survey of shareholder voting trends recognized that corporate political spending is increasingly the subject of shareholder proposal scrutiny. *See* Tonello et al., Shareholder Voting Trends (2018-2022), last updated Nov. 5, 2022, https://corpgov.law.harvard.edu/2022/11/05/shareholder-voting-trends-2018-2022/

The First Amendment protects the right to speech *and* the right to stay silent. *Wooley v. Maynard,* 430 U.S. 705, 714 (1977). A law compelling speech, such as the Act's disclosure provision, "may be justified only if the government proves [it is] narrowly tailored to serve compelling state interests." *Nat'l Inst. Fam. & Life Advocs. v. Becerra,* ("*NIFLA*") 138 S. Ct. 2361, 2371 (2018) (citation omitted). The disclosure portion of the Act is not narrowly tailored. The Act labels entities as "foreign government influenced" by the false proxy of a small percentage of equity ownership or a vague notion of foreign government "indirect participation" in an entity's decisions regarding political activity. Such ownership interest or participation would compel that entity to (falsely, most likely) broadcast that it is: "foreign government influenced." That label is poorly tailored. The Act's dictate that every communication must conspicuously display this mis-label violates the First Amendment. *See NIFLA*, 138 S. Ct. at 2371.

**3. <u>The Act Is Unconstitutional As Applied To Versant</u>**

**a. <u>The City Cannot Influence Versant's Operations, Management, Or Governance</u>**

The City meets the definition of a "foreign government" under the Act. The Act 1064 § (1)(D). ENMAX thus qualifies as a "foreign government-owned entity" because the City is its sole shareholder. *Id.* § (1)(F). And Versant is branded a "foreign government-influenced entity" because it is wholly owned (indirectly) by ENMAX, a "foreign government-owned entity" *Id.* § (1)I(2)(a). The Act restricts Versant's freedom of speech based on the unfounded, conclusory, determination that the City's share ownership of ENMAX equals foreign influence over Versant. Yet, Versant's very existence is premised on the opposite foundation: that the City cannot have any influence over its operations, management, or governance. In fact, the terms of the PUC's formal approval of the Emera Maine Acquisition set forth in the PUC Orders foreclosed the City from exerting any influence over Versant's operations, management, or governance. Compl. ¶¶ 77-81. Versant is not in any way foreign-government-influenced.

**b. The Act Violates Versant's First Amendment Rights Because Versant Cannot Be "Influenced" By The City**

As applied to Versant, the Act is not narrowly tailored to the interest of reducing foreign-government influence in elections because the City cannot be involved in Versant's operations, management, and governance. As opposed to a facial challenge, an as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Co. of Suffolk*, 463 F.3d 167, 175-76 (2d Cir 2006).

Here, the Act violates Versant's First Amendment right to express its voice in political campaigns. Despite being a Maine corporation that cannot, because of multiple layers of restrictions, be influenced by its ultimate parent's shareholder, the City, the Act would prohibit Versant from the very speech it exercised in the effort to defeat the Pine Tree Power Initiative, which sought to terminate Versant's very existence. Versant has a constitutional right to speak on such issues. *See generally, Citizens United*, 558 U.S. 310. And it intends to continue to exercise that voice. Compl. ¶¶ 6, 100, 102.

Versant's right to speech cannot be vitiated on the basis of the Act's labeling it a "foreign-government influenced entity" when the public record shows otherwise and Versant's genesis was based upon preventing any such influence. The City cannot influence Versant's operations, management, or governance in a way to influence its political speech. "In the First Amendment context, fit matters." *McCutcheon*, 572 U.S. at 218. Here, the five-percent threshold to find "foreign-government influence" is poorly tailored to Versant, which meets that test but is lacking in any such influence. The Act thus overly restricts Versant's First Amendment right to speech.

The Act's alternative test to measure a "foreign government-influenced entity"—foreign government or foreign government-owned entity participation in campaign spending decisions—is similarly not narrowly tailored as applied to Versant. *See* Act § 1(E)(2)(b). Again, the City is prohibited

from participating in Versant's operations, management, or governance. Moreover, under federal law, any donations or disbursements made by Versant in connection with a State or local election "may not be derived from foreign national's funds and no foreign national may have any decision-making authority concerning the making of donations or disbursements." *FEC Advisory Opinion* 2006-15 (*TransCanada)*.[19] But, along with Versant, ENMAX has lawfully engaged in political speech by making independent expenditures directed at ballot initiatives—such as contributing to the BQC formed to oppose the Initiative—and intends to do so in the future. Compl. ¶¶ 5-6, 91, 100. Setting aside the 5-percent test, the Act would nonetheless cast Versant as a foreign government-influenced entity because ENMAX participated in such ballot-measure political activity together with Versant. Act § 1(E)(2)(b). As a result, Versant would be prohibited from making contributions and expenditures in *both* candidate elections and ballot initiatives. *See* Act § 2.

Finally, the Act's disclosure requirement is unconstitutional as applied to Versant. The Act compels Versant to broadcast—that it is a "foreign government-influenced entity"—on any communication aimed to influence public policy. *See* Act § 6. This is a falsity: no foreign government can influence Versant's management, government, or operations. *See supra,* Factual Background § B. By compelling Versant to declare that it otherwise would never utter (for it is not true) the Act impermissibly violates the First Amendment because such compelled speech is not narrowly tailored to serve a compelling government interest. *See NIFLA*, 138 S. Ct. at 2371.

For these reasons, as applied to Versant's intended conduct in contributing to candidates and spending money to speak on ballot initiatives,[20] the Act is unconstitutional because it is not narrowly tailored to the interest of preventing foreign-government influence in elections; The City of Calgary cannot influence Versant. *See WRTL,* 551 U.S. at 481; *Randall v. Sorrell*, 548 U.S. 230, 237 (2006).

---

[19] As explained *supra*, the existence of in-place restrictions is inconsistent with strict scrutiny. *See WRTL*, 551 U.S. at 480.
[20] *See* Compl. ¶ 102; Fiegenbaum Dec. at ¶ 10.

**4. The Act Violates The Dormant Foreign Commerce Clause**

Under the Dormant Foreign Commerce Clause, a state law "must not interfere with the federal government's ability to 'speak with one voice when regulating commercial relations with foreign governments.'" *See Portland Pipeline Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 449-50 (D. Me. 2017). This argument is "similar to, but distinct from, the argument that the law violates the foreign affairs power of the federal government." *Natsios*, 181 F.3d at 68; *see Supra* § A.1.d. The underpinning of the "one voice" principle is that the federal government's right to conduct foreign policy must not be infringed upon. *See* Federalist No. 42 (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations."). The Act, however, sets a different policy as to those entities with foreign-government ownership or control and thereby inhibits the federal government's ability to "speak with 'one voice' as to foreign affairs." *See Natsios*, 181 F.3d at 68; *Garamendi*, 539 U.S. 396, 414 (2003). The Act strips domestic corporations with minimal foreign government ownership of their ability to conduct electioneering. An investor, particularly a foreign government entity, could thus view their investment in a entity doing business in Maine as holding a risk that if the political winds blew against that entity, it could be hamstrung in fighting back.

In short, the Act would curtail the free-speech rights of domestic corporations with foreign-government ownership differently than the nation as a whole. Such a policy directly affects the foreign governments which have invested in the nation's businesses. Maine's foreign policy toward such foreign-government investment differs from the federal government. The Act thus "imped[es] the federal government's ability to 'speak with one voice' in foreign affairs, because such state action harms federal uniformity where federal uniformity is essential." *Natsios*, 181 F.3d at 67 (cleaned up). The Act violates the Foreign Dormant Commerce Clause because it undermines the nation's ability to speak with one voice as to how foreigners and foreign governments may participate in electioneering in support of their commercial interests in domestic entities.

**B. Plaintiffs Satisfy The Remaining Standards For Temporary And Preliminary Relief**

Deprivation of the constitutional right to free speech or free association constitutes irreparable harm as a matter of law. *See Elrod v. Burns,* 427 U.S. 347, 373-74 (1974) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *see also Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) ("infringements of free speech, association…is viewed…as to be irremediable by any subsequent relief."' (citing *Pub. Serv. Co. of New Hampshire v. West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987)). Likewise, courts have held that "[d]eprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury." *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997). If the Act were to be implemented and enforced, Plaintiffs would be denied rights secured under the U.S. and Maine Constitutions. Such harm is irreparable and supports issuance of preliminary injunctive relief.

Neither Defendants nor Maine's citizens have a recognized interest in the implementation or enforcement of unconstitutional legislation. The balance of equities thus favors the grant of preliminary injunctive relief. *See Cutting v. City of Portland*, No. 2:13-CV-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014). Finally, the grant of preliminary injunctive relief would serve the public interest; the denial of such relief would not. "A government has no interest in enforcing an unconstitutional law [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." *Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico*, 437 F. Supp. 3d 119, 137 (D.P.R. 2020) (citing *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). "It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997).

**Conclusion**

For all of these, the Court should grant Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, enjoining the implementation and enforcement of the Act.

Dated: December 12, 2023

Respectfully submitted,

/s/Paul McDonald
Paul McDonald
John A. Woodcock III
BERNSTEIN SHUR
100 Middle Street
P.O. Box 9729
Portland, ME 04104
207-774-1200
pmcdonald@bernsteinshur.com
jwoodcock@bernsterishur.com

**Certificate of Service**

The undersigned hereby certifies that on December 12, 2023, a copy of the foregoing Motion For Temporary Restraining Order And Preliminary Injunction With Incorporated Memorandum Of Law has been served, by e-mail, on the below counsel for Defendants:

Johnathan Bolton, Esq.
Assistant Attorney General – Litigation Division
Maine Office of the Attorney General
jonathan.bolton@maine.gov

Paul Suitter, Esq.
Assistant Attorney General – Litigation Division
Maine Office of the Attorney General
Paul.Suitter@maine.gov

Dated: December 12, 2023

/s/ Paul McDonald
Paul McDonald
Counsel for Plaintiffs Versant Power and ENMAX Corporation